IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| PHILIP GEORGE BOTROS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | C.A. NO. 3:16-cv-01264 |
| | § | |
| SUN LIFE ASSURANCE COMPANY OF | § | |
| CANADA, | § | |
| | § | |
| Defendant. | § | |
| | § | |

## DEFENDANT'S INDEX OF STATE COURT MATTERS

Defendant, in connection with the removal of this case to the United States District

Court for the Northern District of Texas, Dallas Division, files its index of state court

matters, pursuant to Local Rule 81, as follows:

| | **State Court Document** | **Date** |
|---|---|---|
| 1. | Docket Sheet | N/A |
| 2. | Plaintiff's Original Petition | 04-13-2016 |
| 3. | Citation Issued to Sun Life Insurance Company of Canada | 04-13-2016 |
| 4. | Civil Case Information Sheet | 04-14-2016 |
| 5. | Affidavit of Service – Sun Life Assurance Company of Canada | 04-25-2016 |
| 6. | Defendant's Original Answer | 05-05-2016 |

Respectfully submitted,

By:   /s/ Bill E. Davidoff
      Bill E. Davidoff
      State Bar No. 00790565
      bill.davidoff@figdav.com

FIGARI + DAVENPORT, LLP
901 Main Street, Suite 3400
Dallas, TX 75202
TEL:  214.939.2000
FAX:  214.939.2090

ATTORNEY FOR DEFENDANT
SUN LIFE ASSURANCE COMPANY OF CANADA

## CERTIFICATE OF SERVICE

I hereby certify that on May 9, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all parties who have appeared and registered with CM/ECF.

      /s/ Bill E. Davidoff
      Bill E. Davidoff

# EXHIBIT "1"

# DC-16-04299 - PHILIP GEORGE-BOTROS vs. SUN LIFE ASSURANCE COMPANY OF CANADA

Case Number: DC-16-04299
File Date: 04/13/2016
Case Status: OPEN

Court: 162nd District Court
Case Type: OTHER (CIVIL)

PLAINTIFF : GEORGE-BOTROS, PHILIP
Address:
   C/O ATTORNEY JAMES L JOHNSON
   6500 GREENVILLE AVE STE 345
   DALLAS TX 75206

**Active Attorneys**
  Lead Attorney:
    **JOHNSON, JAMES L**
    Retained
    Work Phone: 214-363-1629
    Fax Phone: 000-000-0000

DEFENDANT : SUN LIFE ASSURANCE COMPANY OF CANADA
Address:
   BY SERVING ITS REGISTERED AGENT CT CORPORATION SYSTEM
   1999 BRYAN ST STE 900
   DALLAS TX 75201

**04/13/2016 NEW CASE FILED (OCA) - CIVIL**
**04/13/2016 ORIGINAL PETITION**
   petition.original.pdf
   Comment: PETITION
**04/13/2016 ISSUE CITATION**
**04/14/2016 CASE FILING COVER SHEET**
   CivilCaseInfoSheet-signed.pdf
**04/15/2016 CITATION**
   Anticipated Server: ESERVE           Anticipated Method:
   Actual Server: PRIVATE PROCESS SERVER    Returned: 04/25/2016
   Comment: ESERVE/CM
**04/19/2016 CITATION ISSUED**
   DC16-4299.pdf

GEORGE-BOTROS, PHILIP

| | | |
|---|---|---|
| Total Financial Assessment | | $295.00 |
| Total Payments and Credits | | $295.00 |
| | | |
| 4/14/2016 Transaction Assessment | | $295.00 |
| 4/14/2016 CREDIT CARD - TEXFILE (DC)    Receipt # 23354-2016-DCLK    GEORGE-BOTROS, PHILIP | | ($295.00) |

‹                            ›

petition.original.pdf
CivilCaseInfoSheet-signed.pdf
DC16-4299.pdf

SUN LIFE ASSURANCE COMPANY OF CANADA - CITATION

# EXHIBIT "2"

FILED
DALLAS COUNTY
4/13/2016 7:25:42 PM
FELICIA PITRE
DISTRICT CLERK

Christi Underwood

DC-16-04299

No. DC-16-_____

| | | |
|---|---|---|
| PHILIP GEORGE-BOTROS | § | IN THE DISTRICT COURT |
| | § | |
| V. | § | OF DALLAS COUNTY, TEXAS |
| | § | |
| SUN LIFE ASSURANCE COMPANY | § | |
| OF CANADA | § | _____ JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Philip George-Botros [hereinafter "George-Botros"], Plaintiff herein, and would respectfully show the Court the following:

## DISCOVERY CONTROL PLAN

Pursuant to Tex. R. Civ. P. 190.1, George-Botros states that discovery is intended to be conducted under Level 2.

## DEFENDANT

Defendant Sun Life Assurance Company of Canada [hereinafter "Sun Life"] may be served with citation by serving its registered agent, CT Corporation System, 1999 Bryan St., Suite 900, Dallas, Texas 75201.

## INTRODUCTION

George-Botros suffered from a cerebrovascular accident on October 28, 2012. George-Botros filed a claim for LTD benefits under a group policy issued by Sun Life. Sun Life initially approved and paid the claim, but denied the claim for the time period beyond October 20, 2014. As discussed below, the denial flies in the face of George-Botros's well-established deficits following the cerebrovascular accident, particularly as they affect

his cognitive abilities, his vision, and his ability to use his right hand.   Moreover, Sun Life failed to pay the claim when liability was reasonably clear, as is required under Texas law.

By letter dated February 3, 2016, George-Botros provided pre-suit notice to Sun Life under section 541.154(a) of the Texas Insurance Code to give Sun Life an opportunity to resolve the matter before suit is filed.   Sun Life overturned the denial by letter dated February 29, 2016, thereby acknowledging George-Botros's continued disability.   Sun Life failed, however, to fully pay George-Botros's pre-suit damages.

## FACTS

George-Botros summarized a number of factual matters in his pre-suit notice to Sun Life dated February 3, 2016.   With that letter, George-Botros provided Sun Life with a number of supporting documents, copied on CD-ROM in pdf format, described in the letter in the form "Attachment ___."   For convenience, those attachments are referenced below as described in that letter.

## A.   Medical History.

The medical records collected by Sun Life before denying George-Botros's claim are quite incomplete.   Significant omissions are discussed below.

### 1.   Plano Fire EMS.

On October 28, 2012, George-Botros was found on the floor of his home, unable to respond.   The paramedics noted that he had vomited, and exhibited facial droop, and his speech was incomprehensible.   (Attachment 1.)

2.   **Medical Center of Plano**.

George-Botros was rushed by ambulance to Medical Center of Plano.  CT angiography on October 28 determined that George-Botros had suffered the complete occlusion of the left internal carotid artery, resulting in an acute cerebrovascular accident.  An MRI of George-Botros's brain on October 28 demonstrated restricted diffusion along the mesial left temporal cortex, the posterior left internal capsule, and the cortical gyri in the left posterior temporal and left posterior parietal lobes.  Continued evolution of the infarcts was demonstrated by CT on October 30 and 31, including new findings in the mesial left temporal lobe and  the posterior left basal ganglia.   (Attachment 2.)

George-Botros was seen on October 29 by a cardiologist, Ramarao Lankipalli, M.D., who determined from an echocardiogram that the occlusion likely resulted from thromboembolization from the left ventricle of George-Botros's heart.  Dr. Lankipalli also noted that George-Botros was unable to speak, did not appear to comprehend well, was unable to lift his right arm, and could only weakly lift his right leg.  (Attachment 2.)  George-Botros also had difficulty swallowing, as demonstrated by aspiration during a barium swallow function study on October 30.  (Attachment 2.)

By the time of his discharge from Medical Center of Plano on November 3, George-Botros had gained some strength in his right leg from physical therapy, but retained the "flaccid paralysis" of his right arm.   He was discharged to Reliant Rehabilitation.  (Attachment 2.)

### 3.   Reliant Rehabilitation Hospital.

George-Botros received inpatient physical therapy, occupational therapy, and speech therapy at Reliant Rehabilitation Hospital from November 3 to November 21, 2012. By November 21, physical therapy had achieved some improvement, as George-Botros demonstrated the ability to walk 150 feet twice with the use of a "quad cane" (cane with four feet for stability) and a contact guard assist from the physical therapist. Speech therapy included swallowing strategies to avoid aspiration.

George-Botros's occupational therapy involved a number of issues, including learning to write with his non-dominant left hand. For each session beginning November 14, however, the occupational therapist noted that George-Botros understood the educational instructions when they were provided, but that (1) he exhibited "limited carryover" of that education to the succeeding sessions, and (2) the intensity of his therapy was limited by his "cognitive deficits." Indeed, the plan of care for communication/cognition documented that George-Botros's verbal and written expression progressed only from needing maximum assistance to needing moderate assistance, as did his auditory and reading comprehension. (Attachment 3.)

### 4.   Pate Rehabilitation.

George-Botros then received outpatient physical therapy, occupational therapy, and speech therapy at Pate Rehabilitation from November 21, 2012 to October 24, 2013. Sun Life had itself obtained progress updates from Pate Rehabilitation for December 5,

2012 through August 25, 2013.  Sun Life did not obtain, however, many other records from Pate Rehabilitation for that time period, such as the initial evaluations from November 21 to 30, 2012 (Attachment 4), a neurocognitive evaluation dated April 8, 2013 (Attachment 7), and progress updates for August 26, 2013 to October 24, 2013 (Attachment 8).

In particular, George-Botros was initially evaluated at Pate Rehabilitation between November 21 and November 30, 2012.  Of special interest are the results of the initial speech-language evaluation.  George-Botros displayed poor cognitive communication insight, and limited inferential abilities.  He could read only 4 of 10 words with moderate assistance, and could read phrases and sentences only with maximum assistance.  George-Botros was particularly impaired in verbal naming and fluency; he could repeat only 5 of 8 words, and could not repeat them in the correct sequence, and could name only 21 of 60 common objects (from pictures, using the Boston Naming Test) without assistance. (Attachment 4.)

Better task performance on the Boston Naming Test is associated with integrity of the known language areas of the brain, including Wernicke's area in the temporal lobe of the left hemisphere, so impaired performance may indicate diminished integrity of those areas.  (Attachment 5.)  Wernicke's area, in particular, is classically located in the posterior section of the superior temporal gyrus in the left cerebral hemisphere. (Attachment 6.)  As explained above, however, George-Botros

suffered damage to the cortical gyri in the left posterior temporal lobe, as shown by MRI.  (Attachment 2.)

During the time period encompassed by the Pate Rehabilitation progress updates collected by Sun Life, a neurocognitive evaluation was performed at Pate Rehabilitation on April 8, 2013.  Testing revealed that George-Botros was (1) reading single words at an **8th-grade level,** (2) spelling at a **4th-grade level,** and (3) performing arithmetic at a **5th-grade level.**  His attention and memory were in the **impaired range** in (1) visual attention concerning the speed to translate symbols to numbers, whether written or oral, (2) story memory concerning immediate recall and delayed recall, (3) recognition memory for design, and (4) continuous recognition memory concerning immediate recall.  His attention and memory were in the borderline or low average range in almost all other respects.  His language was in the **impaired range** in (1) following complex auditory instructions, (2) letter fluency, (3) category fluency, (4) confrontation naming, and (5) rote sentence repetition.  He had functional use of only his left hand, but was in the borderline range for fine motor dexterity speed with that hand.  For executive functioning, he was in the impaired range for mental flexibility.  (Attachment 7.)

The designation of "impaired" range in the neurocognitive evaluation signifies the lowest statistical range of cognitive function on the Wechsler scales, which includes less than 2% of the adult population.  The highest functional range is "very superior," which includes roughly 2% of the adult population at the opposite

end of the functional spectrum.  In decreasing levels of functionality are the "superior" range (roughly 8% of the adult population), then the "high average" range (roughly 16%), the "average" range (roughly 50%), the "low average" range (roughly 15%), the "borderline" range (roughly 7%), and, finally, the "impaired" range.  The "impaired" range is sometimes termed the "extremely low" range.

Within the Pate Rehabilitation progress updates collected by Sun Life, George-Botros was found by June 30, 2013 to be able to use his right hand to click a computer mouse, but he required extra effort to move the mouse and several attempts to click it, and occasionally needed to use his left hand to position his right hand on the mouse and to re-extend his fingers.  Also by June 30, he was able to send an email response to the therapist's questions, but his "answers had several grammatical and word errors which would be **unacceptable in the work place.**"  By July 28, George-Botros had reported his efforts to work on a part-time basis, but that, despite a number of accommodations, he was "experiencing **difficulties.**"

Beyond the Pate Rehabilitation progress updates collected by Sun Life, subsequent updates reveal that by September 22, 2013, George-Botros acknowledged that he was "**struggling** with his current computer position."  By October 24, despite much improvement over the prior year, George-Botros (1) could complete a convergent naming task with only **83% accuracy** with minimal assistance, (2) could provide a word to complete a phrase with only **80% accuracy**

with minimal assistance, (3) could describe words with only **90% accuracy** with minimal assistance, (4) could find words in a "Word Mess" iPad app with only **84% accuracy** with minimal assistance, (5) required **maximum assistance** to choose the appropriate word in a simple iPad word-association game, and (6) could describe words with only **73% accuracy** within a 30-second time limit.  Moreover, his typing skills had improved to only 7 words per minute. (<u>Attachment 8</u>.)

Also beyond the Pate Rehabilitation progress updates collected by Sun Life, another neurocognitive evaluation was performed at Pate Rehabilitation on August 5, 2015.  Testing revealed that George-Botros was (1) reading single words at an **4th-grade level**, (2) spelling at a **7th-grade level**, and (3) performing arithmetic at a **5th-grade level**.  His attention and memory were in the **impaired range** in (1) digits forward and digits backward, (2) visual attention concerning the speed to translate symbols to numbers, whether written or oral, (3) list learning, (4) immediate recall of the list, both with and without category cues, (5) recognition memory of the list, (6) memory for daily living information, both immediately and after delay, (7) recognition memory for non-verbalizable shapes, both immediately and after delay, and (8) recognition memory for design.  His attention and memory were in the borderline range in almost all other respects.  His language was in the **impaired range** in (1) following complex auditory instructions, (2) letter fluency, (3) category fluency, (4)

confrontation naming, and (5) rote sentence repetition.  He still had functional use of only his left hand, and had improved to low average range for fine motor dexterity speed with that hand, but made 4 errors in motor programming with that hand.  For executive functioning, he still was in the impaired **range** for mental flexibility.  (Attachment 9.)

The conclusions of George-Botros's 2015 neurocognitive evaluation are quite revealing:

> **From this combination of deficits, it is clear that he cannot do his job as a web page designer/developer or administrator nor any other similar job.  In fact, it is difficult to consider any job he could manage, combining his physical problems and his cognitive ones.**

Indeed, the report addressed George-Botros's attempts to work in even a diminished capacity:

> **Although he has been kept on the payroll at his place of employment (a local church), he and his wife are both painfully aware that he is not really able to do the work which was previously assigned to him because he cannot see the computer screen or type well using only his nondominant left hand.  He cannot remember how to use pieces of software which he was quite familiar with previously (such as Photoshop) and he has to look up how to use them every time he does so.  When his wife had left he admitted that he has not done anything to maintain the Website (his supposed job) in over a year. Although his wife is to some degree aware that he is "going through the motions" to support the family, she knows he cannot be doing his job and that they are very fortunate that the Church family has allowed him to keep up the pretense of working for this long.**

## 5.   Brian M. Celico, O.D.

Although the Pate Rehabilitation records address some of George-Botros's visual problems, those issues were more directly addressed by optometrists.  Indeed, Sun Life requested records from

Brian M. Celico, O.D, but only from April 2013. Sun Life received records of a visit to Dr. Celico on April 11, 2013, which included George-Botros's reports of double vision and the results of a visual evoked potential test revealing **no vision to the right side** in either eye.

That problem was first addressed by Dr. Celico in a visit on January 4, 2013. The records from that visit (which Sun Life did not request) include the results of a visual evoked potential test, which also revealed no vision to the right side in either eye. Those records document the medical term for that condition under the "Confrontation Fields Observations" heading: right homonymous hemianopic field defect. (Attachment 10.)

### 6. **Charles Shidlofsky, O.D.**

George-Botros's visual problems were subsquently addressed by Charles Shidlofsky, O.D. In a visit on November 17, 2014, George-Botros complained of visual field cut, double vision, and losing his place while reading. Dr. Shidlofsky confirmed the diagnosis of homonymous hemianopia and ordered another visual evoked potential (VEP) test and other neurosensory testing. The VEP again revealed **no vision to the right side in either eye.** As summarized by Dr. Shidlofsky, the VEP also demonstrated that George-Botros "does not exhibit binocular summation." In other words, George-Botros's brain cannot combine the signals from the left and right optic nerves into a single image. (Attachment 11.)

The additional testing included a reading test, the report from which demonstrated that George-Botros's reading ability "was

**significantly below grade level norms!"** For example, the grade norm for fixations per 100 was 94, with a goal of less than 57, yet George-Botros scored 213 with his left eye and 205 with his right. Similarly, the grade norm for regressions per 100 was 17, with a goal of less than 5, yet George-Botros scored 62 with his left eye and 65 with his right. In a report dated December 17, 2014, Dr. Shidlofsky summarized those results as indicating that **"all elements are reduced significantly."** (Attachment 11.)

The additional testing also included a neurocognitive evaluation, the report from which demonstrated that George-Botros scored only **44% in word memory, 29% in design memory.** He could remember only **40% of 3-letter combinations,** and **none of them in the correct sequence.** His composite scores were **only 39% in verbal** and **27% in visual.** Dr. Shidlofsky summarized those results as indicating that George-Botros "has **significantly reduced verbal memory, visual memory and sequential memory**" and "showed reduced visual-motor speed and reaction time." (Attachment 11.)

The additional testing also included a vestibular-ocular reflex (VOR) test. As summarized by Dr. Shidlofsky, the test "is basically an eye-head coordination test that measures the accuracy to which the eyes remain focused on an object while the head is moving." George-Botros's test results showed "**reduced reflexes horizontally and absent reflexes vertically.**" In other words, if George-Botros moves his head while reading, particularly in the vertical plane, he is likely to lose his place. Significantly, the

same relative movement occurs when his head remains motionless but an image on a computer screen is scrolled up or down.  (Attachment 11.)

**B.    <u>Job History</u>.**

Sun Life already has a copy of George-Botros's job description as Webmaster for Covenant Church.   In short, the job involves creating and building websites, maintaining them, providing support for other departments and church members, and finding solutions and locating resources to solve problems, implement new ideas and upgrade services.  (Attachment 12.)

The job description was provided to Sun Life by letter dated December 15, 2014 from Cheryl Mitchell, Covenant Church's Human Resources Director.  Ms. Mitchell explained that George-Botros was **"unable to perform his job duties as required due to his limited capacity from the stroke that he suffered."**   Covenant Church allowed him to work part-time "because as a church we wanted to get him back in his work environment along with his peers to help facilitate the healing process."  His decreased functionality was estimated as **"approximately 80-90% decline in efficiency and capability since the accident."**  Accordingly, Covenant Church has had to "send the work out to a third party in order to fulfill our needs."  (Attachment 12.)

Ms. Mitchell also provided Sun Life with a statement dated December 11, 2014 from George-Botros's prior manger, Helen Masvikeni-Masango. Ms. Masvikeni-Masango was familiar with George-Botros's job, and his prior ability to perform it full time with

minimal supervision.   Since his stroke, however, Ms. Masvikeni-Masango reports:

> **He can't type as fast since he doesn't have much use of his right arm and hand.**
>
> **He struggles to read now, so can't process emails coming in well enough.**
>
> **He can't work without minimal supervision on websites and any webpages.**
>
> **He can't work with clients well enough with out supervision.**
>
> **He struggles with processing information, so it slows the work flow down considerably.**

(Attachment 12.)

C.   **Procedural History of Disability Claim.**

  1.   **Initial LTD Claim Submission.**

George-Botros completed his portion of Sun Life's claim packet on January 14, 2013.   Part of that form, created and provided by Sun Life and used throughout George-Botros's claim,[1] was entitled "Attending Physician Statement - **Physical conditions only.**" Consistent with that title, section 5 of the form inquires of "Restrictions and Limitations" in various **physical** activities, like grasping, walking and lifting.   Section 5 concludes by inquiring of "Restrictions and Limitations" in only two categories:

---

[1]

The form completed on January 14, 2013 was labeled in the lower left corner: "XGR/1642."   The same form was completed, for example, on March 16, 2014 and September 4, 2014.   These later forms were discussed by Sun Life's outside consultant, as discussed below.

(1) **"Physical Impairment"** and (2) "Cardiac." Notably, neither that form, nor any other form provided by Sun Life during George-Botros's claim, ever inquired of the his cognitive or neurocognitive restrictions, limitations or impairments.

 **2.   Initial Approval of LTD Claim.**

Sun Life initially approved George-Botros's LTD claim by letter dated February 4, 2013.

Sun Life referred certain questions to a medical consultant, Anita Bolster, R.N., on July 15, 2013. Ms. Bolster responded on July 25, 2013, commenting:

> **The typical recovery following traumatic brain injury such as with CVA [cerebrovascular accident] is up to one year. . . .**
>
> **While it is possible that he will have an additional improvement in function, it is not clear how much more he will gain at this point.**
>
> **. . .**
>
> **Given the significant decreased strength in the right upper extremity (his dominant hand), it would be very difficult to engage in activities that would require fine manipulation such as writing, drawing and key boarding. . . .**
>
> **He has double vision which would make any activity that required visual acuity difficult such as viewing computer screen, reading, watching videos or TV.**
>
> **Based on the residual deficits resulting from the stroke, he would be unable to engage in even sedentary activity . . . .**

Ms. Bolster responded on June 3, 2014 to a later referral, commenting:

> **Typical recovery following a stroke is up to one year. He is now well beyond that time frame and as such it is**

> **reasonable to conclude that additional improvement is not likely.**

Ms. Bolster responded on September 25, 2014 to a later referral, commenting:

> **Typical recovery following a brain injury such as a stroke is up to one year. He is beyond that time frame and will not likely make any significant progress beyond his current status.**

Ms. Bolster responded on October 7, 2014 to a later referral, commenting:

> **Typical recovery following a brain injury such as a stroke is up to one year. He is beyond that time frame and will not likely make any significant progress beyond his current status.**

### 3.   Sun Life's Initial Denial of LTD Claim.

After all of Ms. Bolster's consistent assessments from July 25, 2013 to October 7, 2014, she was provided "new information" that Sun Life had allegedly obtained by telephone from Ms. Mitchell at Covenant Church, to the effect that George-Botros was "doing okay" at work. On the basis thereof, Ms. Bolster suddenly concluded on October 9, 2014 that George-Botros "would be able to engage in sedentary activity." Ms. Bolster was specifically asked to address "the impact of the cognitive deficits," but only remarked, without explanation, that "he is able to work around this deficit." On the basis of that unexpected and unexplained miracle cure, Sun Life denied his LTD claim by letter dated October 30, 2014.[2] The letter offered to review the denial if requested.

---

[2]

The last full-month benefit payment before the denial was for September 2014. Based on pay from part-time work at Covenant

### 4.   <u>Sun Life's Second Denial of LTD Claim</u>.

In response to George-Botros's request of March 11, 2015 that Sun Life review its denial, Sun Life again denied the claim by letter dated May 1, 2015.  The letter summarizes a number of facets from the claim file that Sun Life deemed relevant.

For example, the denial letter mentions an analysis by a "Vocational Rehabilitation Consultant" concerning "the **physical** functional requirements" of George-Botros's occupation.  Neither the letter nor the analysis address any **cognitive** requirements.

The denial letter quotes two clinical notes from Dr. Nguyen, reporting that George-Botros gets his "work done."  The letter fails to mention the letter from Ms. Mitchell and the statement from Ms. Masvikeni-Masango, who were knowledgeable about George-Botros's work and the fact that he was <u>not</u> getting it done.

The letter mentions some of Ms. Bolster's observations concerning the unlikelihood of significant improvement beyond one year after a stroke.  The letter offers no evidence or rationale for Sun Life's conclusion that George-Botros had suddenly experienced terrific progress beyond one year from his stroke on October 28, 2012.

---

Church, reflected in two paychecks, Sun Life's records show a correct calculation of the LTD payment.  Sun Life's proper calculation did not get communicated, apparently, to its check-writing computer.  Instead, Sun Life sent a check in a gross amount that was less than the calculated amount by **$364.10**.  Sun Life had sent a check in the same amount for August 2014, which was correct because of the odd circumstance that George-Botros received three paychecks in that month.  Sending that same amount in September was erroneous.

The letter mentions the neurocognitive evaluation by Pate Rehabilitation on April 8, 2013, but dismisses its detailed test results in favor of the "improvement" reflected in "the examination findings in the subsequent medical records." Dr. Nguyen, however, did not purport to perform an "examination" or conduct any testing to determine whether or not George-Botros had experienced any "improvement" in his cognitive (or any other work-related) capabilities.

The denial was based almost entirely on the opinions from an outside consultant, David Hoenig, M.D., from whose report the letter quotes at length. Sun Life solicited Dr. Hoenig's services through a referral submitted to Network Medical Review (NMR) by letter dated April 21, 2015. As NMR explains on the home page for its website, NMR offers "solutions for the insurance, managed care, legal and medical industries." NMR offers no solutions to patients or claimants. (Attachment 13.)

Dr. Hoenig's report, dated April 28, 2015, lists the records that Sun Life provided to Dr. Hoenig for his review. None of the attachments to George-Botros's letter of February 3, 2016 had been provided to Dr. Hoenig, other than the neurocognitive evaluation from Pate Rehabilitation dated April 8, 2013. Dr. Hoenig's report summarizes that evaluation into just two sentences, comprised of only 25 words:

> His findings are consistent with his stroke. He has impairment in speech and language, memory, spelling, arithmetic, and the ability to quickly shift cognitive set.

Significantly, Dr. Hoenig's report reveals by omission that Sun Life did <u>not</u> provide him with the descriptions from Ms. Mitchell and Ms. Masvikeni-Masango concerning George-Botros's demonstrated <u>inability</u> to adequately perform his job.

Dr. Hoenig's report states, without explanation, that the neurocognitive evaluation "is no longer valid." Instead, Dr. Hoenig's report reveals his repeated reliance on Dr. Nguyen's notes that George-Botros gets his "work done." This represents a particularly myopic view of the evidence, favoring a vague comment over the detailed test results of the neurocognitive evaluation. Moreover, Dr. Hoenig's view was obtained from the vantage point of his ignorance the observations from George-Botros's managers, an ignorance that Sun Life chose to foster by withholding those observations from the records it provided to Dr. Hoenig.

The report also reveals Dr. Hoenig's reliance on two Attending Physician Statements that Dr. Nguyen completed on March 16, 2014 and September 4, 2014, which supposedly indicated that George-Botros could do "sedentary work" or "sedentary activity." As discussed above, however, the Sun Life form completed by Dr. Nguyen addressed **"Physical conditions only"** and **"Physical Impairment."** The form did <u>not</u> address <u>cognitive</u> capabilities, so is of no use on the question of George-Botros's cognitive disabilities.

### 5.  <u>George-Botros's Notice Letter of February 3, 2016</u>.

By letter dated February 3, 2016, George-Botros provided pre-suit notice to Sun Life under section 541.154(a) of the Texas Insurance Code. Pursuant to section 541.154(b)(2), George-Botros

also provided notice of the actual damages available to him under section 541.152, including interest on the withheld LTD benefits, and attorney's fees of $16,650.00.  The letter also stated:

> Pursuant to section 541.156(a) of the Texas Insurance Code, Sun Life may make a settlement offer in response to this written notice.  Pursuant to section 541.157, any such settlement offer must include an offer to pay the following amounts, separately stated:
>
> > (1)   an amount of money or other consideration, reduced to its cash value, as settlement of the claim for damages; and
> >
> > (2)   an amount of money to compensate the claimant for the claimant's reasonable and necessary attorney's fees incurred as of the date of the offer.

### 6.   <u>Sun Life's Approval and Partial Payment of Benefits</u>.

By letter dated February 29, 2016, Sun Life stated that "Sun Life has determined that Mr. George-Botros has now provided proof of Total Disability at this time."  Sun Life also stated that "the denial of the claim has been overturned."

Sun Life subsequently paid benefits in the gross amount of $31,651.45.  The check stub described such payment as constituting benefits "through 02/29/16."

Sun Life did not pay the full amount of LTD benefits through February 29, 2016 (consisting of the amount erroneously withheld from the benefits for September 2014, plus the amounts withheld for the period from October 20, 2014 through February 29, 2016).  Sun Life did not pay any interest or attorney's fees.  Sun Life thus only mitigated some of George-Botros's actual damages.  Sun Life did not otherwise make a settlement offer under section 541.157.

## GOVERNING LEGAL PRINCIPLES

### A.   George-Botros's Claim Is Governed by Texas Law, Not by ERISA.

Sun Life's denial letter dated May 1, 2015 states that George-Botros "may have the right to bring a civil action under the Employee Retirement Income Security Act of 1974 (ERISA)." That statement is erroneous. Pursuant to 29 U.S.C. § 1003(b)(2), ERISA does not apply to a "church plan," such as the one established by Covenant Church. George-Botros's claim is accordingly governed by Texas law.

### B.   Liability for Breach of Contract, for "Bad Faith" Denial of Benefits, and for Deceptive Trade Practices, Under Texas Law.

Insurers are subject to Texas law for breach of contract, for breach of the common-law duty of good faith and fair dealing (often called a "bad faith" denial), as well as for breach of the statutory equivalent of such duty under section 541.060(a)(2) of the Texas Insurance Code.

Texas law imposes liability upon an insurer under common law for what is known as a "bad faith" cause of action. Liability arises from the denial of a claim without a reasonable basis. That aspect of the common law claim has been codified into section 541.060(a)(2)(A) of the Texas Insurance Code. In particular, that subsection imposes liability on insurers that fail to pay a claim "with respect to which the insurer's liability has become reasonably clear." In addition, subsection 541.060(a)(7) imposes liability on insurers for "refusing to pay a claim without conducting a reasonable investigation."

An insurer cannot insulate itself from "bad faith" liability by merely engaging an expert.   The Texas Supreme Court observed that "we have never held that the mere fact that an insurer relies upon an expert's report to deny a claim automatically forecloses bad faith recovery as a matter of law."   <u>State Farm Lloyds v. Nicolau</u>, 951 S.W.2d 444, 448 (Tex. 1997).

> Instead, we have repeatedly acknowledged that an insurer's reliance upon an expert's report, standing alone, will not necessarily shield the carrier if there is evidence that the report was not objectively prepared or the insurer's reliance on the report was unreasonable.
> . . .
>
> . . .
>
> In this case, the [plaintiffs] presented evidence from which a fact-finder could logically infer that [the expert's] reports were not objectively prepared, that [the insurer] was aware of [the expert's] lack of objectivity, and that [the insurer's] reliance on the reports was merely pretextual.  Accordingly, there is some evidence that [the insurer] denied the claim without a reasonable basis or without attempting to objectively determine whether its liability had become reasonably clear.

<u>Id</u>.

## C.   <u>Common Issues Arising in Bad Faith Denials</u>.

In another context, the United Supreme Court addressed the issue of "biased claims administration" in <u>Metropolitan Life Ins. Co. v. Glenn</u>, 128 S. Ct. 2343, 2351 (2008).   As an example, the Supreme Court cited the Unum/Provident scandal discussed in a law review article.   <u>Id</u>.; <u>see</u> John H. Langbein, <u>Trust Law as Regulatory Law:   The Unum/Provident Scandal and Judicial Review of Benefit Denials Under ERISA</u>, 101 Nw. U. L. Rev. 1315, 1317-21 (2007).   The article, in turn, gave as an example of claims that were "the most

vulnerable" to pressure for "bad faith termination" those claims involving "so-called subjective illnesses, illnesses that don't show up on x-rays or MRIs, like mental illness." <u>Id</u>. at 1319 (emphasis added). That reasoning applies as well to instances involving brain damage from a stroke: the damage can be confirmed by MRI, but the cognitive deficits arising from such brain damage (like those from mental illness) do not show up on an MRI.

The Unum/Provident scandal resulted in corrective action imposed by the Department of Labor and a number of state regulators.

> The examiners found several areas of concern, including excessive reliance upon in-house medical professionals, unfair construction of attending physician or independent medical exam reports, failure to evaluate the totality of the claimant's medical condition, and inappropriate burdens placed on claimants to justify their eligibility for benefits.

<u>Wakkinen v. Unum Life Ins. Co.</u>, 531 F.3d 575, 582 (8th Cir. 2008).

### D.  <u>Damages in the Form of Pre-Suit Attorney's Fees</u>.

Under section 541.154(b) of the Texas Insurance Code, "actual damages," for the purposes of pre-suit notice of a claim, is specifically stated as "including attorney's fees reasonably incurred in asserting the claim."

### E.  <u>Damages in the Form of Interest on Amounts Due</u>.

Under Texas law, two forms of interest are available as damages for an insurer's failure to timely pay policy benefits.

#### 1.  <u>Prejudgment Interest at 5%</u>.

The Texas Supreme Court has "consistently viewed prejudgment interest as falling within the common law meaning of damages."

Brainard v. Trinity Universal Ins. Co., 216 S.W.3d 809, 812 (Tex. 2006). "Interest" is "compensation for the . . . detention of money." Carl J. Battaglia, M.D., P.A. v. Alexander, 177 F.3d 893, 907 (Tex. 2005). Prejudgment interest is "compensation allowed by law as additional damages for lost use of the money due." Johnson & Higgins v. Kenneco Energy, Inc., 962 S.W.2d 507, 528 (Tex. 1998)(citations omitted). Equitable prejudgment interest on amounts due under a contract is calculated as simple interest at the postjudgment rate. Id. at 532. The Texas postjudgment rate has been at 5% since prior to 2012.

When an amount due is paid, "credit is applied first to accrued prejudgment interest and then to principal." Brainard, 216 S.W.3d at 817; see also Carl J. Battaglia, 177 F.3d at 908. "This approach, known as the 'declining principal' formula, is the proper way to apply credits in the calculation of prejudgment interest." Brainard, 216 S.W.3d at 816.

### 2. **Penalty Interest of 18%**.

Under section 542.058 of the Texas Insurance Code, an "insurer shall pay damages" under section 542.060 if it "delays payment" after receiving notice of a claim and all requested documents. Under section 542.060, "an insurer that is liable for a claim under an insurance policy" and that delays payment is liable for "interest on the amount of the claim at the rate of 18 percent a year as damages."

## FATAL FLAWS IN SUN LIFE'S DENIAL OF BENEFITS

**A.   George-Botros Was Disabled Under the Policy.**

This case presents the question of whether George-Botros was disabled, on and after October 21, 2014, from the effects of his cerebrovascular accident.   The evidence, summarized above, overwhelmingly indicates that he was disabled under any of the criteria expressed in the insurance contract.

To briefly recap, pursuant to neurocognitive testing on April 8, 2013, George-Botros displayed abilities at the **grade-school level** for reading, spelling and arithmetic.  He displayed abilities in the **impaired range** for attention, memory, language and mental flexibility.   The "impaired" designation indicates that his cognitive function in those areas fell within the lowest range of the adult population: **the bottom 2%**.  He had functional use of only his left hand, but was in the borderline range for fine motor dexterity speed with that hand.   (Attachment 7.)   No reasonable juror could conclude that any employer (other than for charitable purposes) would employ an adult professional with only grade-school abilities and with such impaired cognitive functions.

As shown by the Pate Rehabilitation records already collected by Sun Life, George-Botros was able by June 30, 2013, to use his right hand to click a computer mouse, but only with the assistance of his non-dominant left hand.  He was able to send an email, but only with "several grammatical and word errors which would be **unacceptable in the work place.**"  By July 28, George-Botros had tried to work on a part-time basis with a number of accommodations,

**PLAINTIFF'S ORIGINAL PETITION - Page 24**
petition.original.wpd

but he was "experiencing **difficulties**."

By September 22, 2013, George-Botros was still "**struggling** with his current computer position." By October 24, his typing skills had improved to only 7 words per minute, and he could complete various word tasks with **accuracies between 73% and 90%.** (<u>Attachment 8</u>.) No reasonable juror could conclude that any employer would tolerate these percentages from an adult professional.

Neurocognitive testing on August 5, 2015 revealed that George-Botros continued to display abilities at the **grade-school level** for reading, spelling and arithmetic. He continued to display abilities in the **impaired range** for attention, memory, language and mental flexibility. He had functional use of only his left hand, had only improved to low average range for fine motor dexterity speed with that hand, but with many errors in motor programming with that hand. Again, no reasonable juror could conclude that any employer would employ an adult professional with only grade-school abilities and with such impaired cognitive functions.

Indeed, the neurocognitive evaluation concluded that, from George-Botros's combination of deficits, "**it is clear that he cannot do his job as a web page designer/developer or administrator nor any other similar job.**" That is why "**he and his wife are both painfully aware that he is not really able to do the work which was previously assigned to him,**" and "**[w]hen his wife had left he admitted that he has not done anything to maintain the Website (his**

supposed job) in over a year," and that "the Church family has allowed him to keep up the pretense of working." (Attachment 9.)

George-Botros's reading problems are hindered as well by his visual problems, including double vision and lack of binocular summation, and **no vision to the right side** in either eye (right homonymous hemianopia), as addressed by Dr. Celico in early 2013 (Attachment 10) and by Dr. Shidlofsky in November and December 2014 (Attachment 11). The reading test administered by Dr. Shidlofsky demonstrated that George-Botros's reading ability "was **significantly below grade level norms!**" Indeed, "**all elements are reduced significantly,**" and he "has **significantly reduced verbal memory, visual memory and sequential memory,**" measured between **27% and 44%**. Moreover, in the vestibular-ocular reflex (VOR) test, he displayed "**absent reflexes vertically,**" such that he loses his place while reading if he moves his head or scrolls an image on a computer screen. (Attachment 11.)

Ms. Mitchell at Covenant Church explained to Sun Life in December 2014 that George-Botros was "**unable to perform his job duties as required due to his limited capacity from the stroke that he suffered,**" and that his decreased functionality was estimated as "**approximately 80-90% decline in efficiency and capability since the accident,**" such that the church had to "send the work out to a third party in order to fulfill our needs." Ms. Masvikeni-Masango at Covenant Church further explained George-Botros's struggles with reading and processing information, and with typing, such that he

**"can't work without minimal supervision on websites and any webpages.** (Attachment 12.)

Sun Life's letter dated February 29, 2016, overturning its denial, serves as an acknowledgment that George-Botros has remained disabled under the terms of the Sun Life policy.

All conditions precedent have been performed or have occurred.

**B.   Sun Life's "Bad Faith" Denial.**

As discussed above, Sun Life's liability to pay LTD benefits was reasonably clear.  Moreover, Sun Life failed to satisfy its duty to conduct a reasonable investigation before denying the claim.  Notably, all of the enclosures to George-Botros' letter dated February 3, 2016 were available to Sun Life before it issued its denial letter dated October 30, 2014 except for the neurocognitive evaluation dated August 5, 2015 (Attachment 9), the records from Dr. Shidlofsky from November 17 to December 17, 2014 (Attachment 11), and the letter to Sun Life from Ms. Mitchell at Covenant Church (Attachment 12).  Moreover, all of the enclosures to George-Botros' letter dated February 3, 2016 were available to Sun Life before it issued its denial letter dated May 1, 2015, except for the neurocognitive evaluation dated August 5, 2015 (Attachment 9).

Sun Life's failure to pay LTD benefits past October 20, 2014 subjects it to liability under both the Texas Insurance Code and the Texas common law of "bad faith."  In short, Sun Life refused to pay George-Botros' claim without conducting a reasonable investigation, and failed to pay the claim after its liability

became reasonably clear.  In addition, Sun Life's reliance on Ms. Bolster's opinions of October 9, 2014, and on Dr. Hoenig's report dated April 28, 2015, were "pretextual," a circumstance discussed in Nicolau.  Futhermore, Sun Life has repeated many of the well-documented Unum errors summarized in Wakkinen.

Sun Life deprived Ms. Bolster and Dr. Hoenig of the evidence that was available before the matter was referred to them.  Of great concern is that Sun Life failed to provide Dr. Hoenig with records it already had: the descriptions from Ms. Mitchell and Ms. Masvikeni-Masango concerning George-Botros's demonstrated inability to adequately perform his job.  (Attachment 12.)  That omission is particularly telling, given Dr. Hoenig's repeated reliance on Dr. Nguyen's vague notes that George-Botros gets his "work done."  In other words, Sun Life chose to keep Dr. Hoenig ignorant of more direct evidence that would contradict its denial, such that reliance on his opinions was "merely pretextual" and "unreasonable."  See Nicolau, 951 S.W.2d at 448.

Also "merely pretextual" is Dr. Hoenig's reliance (and, hence, Sun Life's reliance) on the Attending Physician Statements that supposedly indicated that George-Botros could do "sedentary work" or "sedentary activity," when Sun Life prepared those forms to address "**Physical conditions only**" and "**Physical Impairment**."  The forms did not address cognitive capabilities, and Sun Life's attempt to pretend otherwise constitutes bad faith.

Borrowing a page from Unum's book, Sun Life engaged in "unfair construction" of attending physician reports, and "fail[ed] to

evaluate the totality of [George-Botros's] medical condition," and placed "inappropriate burdens placed on [George-Botros] to justify [his] eligibility for benefits."  See <u>Wakkinen</u>, 531 F.3d  at 582.

### <u>RELIEF REQUESTED</u>

**A.   <u>Monetary Relief</u>.**

As summarized above, Sun Life is liable to George-Botros for his actual damages, including prejudgment interest at 5%, penalty interest of 18%, and pre-suit attorney's fees of $16,650.00.  As summarized above, Sun Life is entitled to a credit of $31,651.45. Under the "declining principal" formula, that credit is applied first to accrued interest and then to principal.  After application of that credit, some of the principal remains unpaid, and interest continues to accrue on that amount.

**B.   <u>Declaratory Relief</u>.**

Section 37.004(a) of the Texas Civil Practice and Remedies Code authorizes the Court to enter declaratory relief concerning the "rights, status or other legal relations" under a statute or contract affecting George-Botros, and to determine "any question of construction or validity arising under" the statute or contract. Section 37.004(a) thus authorizes declaratory relief regarding statutes that affect George-Botros, including sections 541.060(a)(2)(A), 541.060(a)(7), 541.152, 541.154, 541.157, 542.058 and 542.060 of the Texas Insurance Code.  Section 37.004(a) also authorizes declaratory relief regarding a contract that affects George-Botros, including the Sun Life policy.

Appropriate declaratory relief in this case would include:

- Under sections 541.152, 541.154 and 541.157, a claimant's pre-suit attorney's fees incurred due to an insurer's violation of 541.060(a)(2)(A) or 541.060(a)(7) are recoverable as damages.

- Under sections 541.152, 541.154 and 541.157, after a claimant has incurred pre-suit attorney's fees due to an insurer's violation of 541.060(a)(2)(A) or 541.060(a)(7) and has provided pre-suit notice to the insurer, the insurer cannot thereafter avoid liability for pre-suit attorney's fees merely by paying only certain benefits due under the insurance contract.

- Equitable prejudgment interest should be calculated using the "declining principal" formula, with Sun Life's payment of $31,651.45 under the insurance contract credited first to accrued interest and then to principal.

- Under 542.058 and 542.060, the 18% penalty interest should be calculated using the "declining principal" formula, with Sun Life's credit of $31,651.45 under the insurance contract credited first to accrued interest and then to principal.

- Sun Life's insurance contract does not provide for or require a "reconsideration (second appeal)" of Sun Life's denial by letter dated October 30, 2014.

- Sun Life violated section 611.004 by disclosing information from George-Botros's confidential communications and records to Ms. Howard.

WHEREFORE, PREMISES CONSIDERED, George-Botros prays that he recover from Sun Life his actual damages, including pre-suit attorney's fees, 5% equitable prejudgment interest and 18% penalty interest as summarized above, and declaratory relief as summarized above, and additional attorney's fees and expenses incurred in this lawsuit, postjudgment interest at the maximum legal rate, and all costs of court, for which the monetary relief may total over $100,000 but not more than $500,000, and for such other and further relief to which he may be justly entitled.

Respectfully submitted,

/s/ James L. Johnson
James L. Johnson
Texas Bar No. 10742020

THE JOHNSON LAW FIRM
6500 Greenville Avenue
Suite 345
Dallas, Texas  75206
Telephone:    214/363-1629
Telecopier:   214/363-9173
Email: jamesljohnson@covad.net

ATTORNEY FOR PLAINTIFF
PHILIP GEORGE-BOTROS

# EXHIBIT "3"

# FORM NO. 353-3 - CITATION
# THE STATE OF TEXAS

To:

**SUN LIFE ASSURANCE COMPANY OF CANADA**
**BY SERVING ITS REGISTERED AGENT CT CORPORATION SYSTEM**
**1999 BRYAN ST STE 900**
**DALLAS TX 75201**

GREETINGS:
You have been sued. You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10 o'clock a.m. of the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you. Your answer should be addressed to the clerk of the **162nd District Court** at 600 Commerce Street, Ste. 101, Dallas, Texas 75202.

Said Plaintiff being **PHILIP GEORGE-BOTROS**

Filed in said Court **13th day of April, 2016** against

**SUN LIFE ASSURANCE COMPANY OF CANADA**

For Suit, said suit being numbered **DC-16-04299,** the nature of which demand is as follows:
Suit on **OTHER (CIVIL)** etc. as shown on said petition ,
a copy of which accompanies this citation. If this citation is not served, it shall be returned unexecuted.

WITNESS: FELICIA PITRE, Clerk of the District Courts of Dallas, County Texas.
Given under my hand and the Seal of said Court at office this 15th day of April, 2016.

ATTEST: FELICIA PITRE, Clerk of the District Courts of Dallas, County, Texas

By␣␣␣␣␣␣/s/ Carmen Moorer␣␣␣␣␣␣, Deputy
␣␣␣␣␣␣CARMEN MOORER

---

**ESERVE**

**CITATION**

**DC-16-04299**

**PHILIP GEORGE-BOTROS**
vs.
**SUN LIFE ASSURANCE COMPANY OF CANADA**

ISSUED THIS
**15th day of April, 2016**

FELICIA PITRE
Clerk District Courts,
Dallas County, Texas

By: CARMEN MOORER, Deputy

**Attorney for Plaintiff**
JAMES L JOHNSON
JAMESLJOHNSON@COVAD.NET
SUITE 345 LB 30
6500 GREENVILLE AVENUE
DALLAS TX 75206
214-363-1629

# DALLAS COUNTY
# SERVICE FEES
# NOT PAID

# OFFICER'S RETURN

Case No. : DC-16-04299

Court No.162nd District Court

Style: PHILIP GEORGE-BOTROS

vs.

SUN LIFE ASSURANCE COMPANY OF CANADA

Came to hand on the _____day of _____, 20_____, at _____o'clock_____.M. Executed at _____,

within the County of _____ at _____ o'clock _____ .M. on the _____ day of_____,

20_____, by delivering to the within named

_____

_____

each, in person, a true copy of this Citation together with the accompanying copy of this pleading, having first endorsed on same date of delivery.  The distance actually traveled by me in serving such process was _____miles and my fees are as follows:   To certify which witness my hand.

|  |  |  |
|---|---|---|
| For serving Citation | $_____ | _____ |
| For mileage | $_____ | of_____County, _____ |
| For Notary | $_____ | By_____Deputy |

(Must be verified if served outside the State of Texas.)

Signed and sworn to by the said_____before me this_____day of _____, 20_____,

to certify which witness my hand and seal of office.

_____

Notary Public_____County_____

# EXHIBIT "4"

# CIVIL CASE INFORMATION SHEET

FILED
DALLAS COUNTY
4/14/2016 11:03:25 AM
FELICIA PITRE
DISTRICT CLERK

CAUSE NUMBER *(FOR CLERK USE ONLY):* _____  Court *(FOR CLERK USE ONLY):* _____

STYLED  Philip George-Botros v. Sun Life Assurance Company of Canada
(e.g., John Smith v. All American Insurance Co; In re Mary Ann Jones; In the Matter of the Estate of George Jackson)

A civil case information sheet must be completed and submitted when an original petition or application is filed to initiate a new civil, family law, probate, or mental health case or when a post-judgment petition for modification or motion for enforcement is filed in a family law case. The information should be the best available at the time of filing.

## 1. Contact information for person completing case information sheet:

Name: James L Johnson
Email: jamesljohnson@covad.net
Address: 6500 Greenville Avenue, Suite 345
City/State/Zip: Dallas, Texas 75206
Telephone: 214/363-1629
Fax: 214/363-9173
State Bar No: 10742020

Names of parties in case:
Plaintiff(s)/Petitioner(s): Philip George-Botros
Defendant(s)/Respondent(s): Sun Life Assurance Company of Canada

Person or entity completing sheet is:
[ ] Attorney for Plaintiff/Petitioner
[x] *Pro Se* Plaintiff/Petitioner
[ ] Title IV-D Agency
[ ] Other:

Additional Parties in Child Support Case:
Custodial Parent:
Non-Custodial Parent:
Presumed Father:

## 2. Indicate case type, or identify the most important issue in the case (select only 1):

### Civil

**Contract**
Debt/Contract
[ ] Consumer/DTPA
[ ] Debt/Contract
[ ] Fraud/Misrepresentation
[ ] Other Debt/Contract:
Foreclosure
[ ] Home Equity—Expedited
[ ] Other Foreclosure
[ ] Franchise
[ ] Insurance
[ ] Landlord/Tenant
[ ] Non-Competition
[ ] Partnership
[ ] Other Contract:

**Injury or Damage**
[ ] Assault/Battery
[ ] Construction
[ ] Defamation
Malpractice
[ ] Accounting
[ ] Legal
[ ] Medical
[ ] Other Professional Liability:
[ ] Motor Vehicle Accident
[ ] Premises
Product Liability
[ ] Asbestos/Silica
[ ] Other Product Liability List Product:
[ ] Other Injury or Damage:

**Real Property**
[ ] Eminent Domain/Condemnation
[ ] Partition
[ ] Quiet Title
[ ] Trespass to Try Title
[ ] Other Property:

**Related to Criminal Matters**
[ ] Expunction
[ ] Judgment Nisi
[ ] Non-Disclosure
[ ] Seizure/Forfeiture
[ ] Writ of Habeas Corpus— Pre-indictment
[ ] Other:

### Family Law

**Marriage Relationship**
[ ] Annulment
[ ] Declare Marriage Void
Divorce
[ ] With Children
[ ] No Children

**Other Family Law**
[ ] Enforce Foreign Judgment
[ ] Habeas Corpus
[ ] Name Change
[ ] Protective Order
[ ] Removal of Disabilities of Minority
[ ] Other:

**Post-judgment Actions (non-Title IV-D)**
[ ] Enforcement
[ ] Modification—Custody
[ ] Modification—Other
**Title IV-D**
[ ] Enforcement/Modification
[ ] Paternity
[ ] Reciprocals (UIFSA)
[ ] Support Order
**Parent-Child Relationship**
[ ] Adoption/Adoption with Termination
[ ] Child Protection
[ ] Child Support
[ ] Custody or Visitation
[ ] Gestational Parenting
[ ] Grandparent Access
[ ] Parentage/Paternity
[ ] Termination of Parental Rights
[ ] Other Parent-Child:

**Employment**
[ ] Discrimination
[ ] Retaliation
[ ] Termination
[ ] Workers' Compensation
[ ] Other Employment:

**Other Civil**
[ ] Administrative Appeal
[ ] Antitrust/Unfair Competition
[ ] Code Violations
[ ] Foreign Judgment
[ ] Intellectual Property
[ ] Lawyer Discipline
[ ] Perpetuate Testimony
[ ] Securities/Stock
[ ] Tortious Interference
[x] Other: Violations of Texas Insurance Code

**Tax**
[ ] Tax Appraisal
[ ] Tax Delinquency
[ ] Other Tax

### Probate & Mental Health
Probate/Wills/Intestate Administration
[ ] Dependent Administration
[ ] Independent Administration
[ ] Other Estate Proceedings
[ ] Guardianship—Adult
[ ] Guardianship—Minor
[ ] Mental Health
[ ] Other:

## 3. Indicate procedure or remedy, if applicable (may select more than 1):
[ ] Appeal from Municipal or Justice Court
[ ] Arbitration-related
[ ] Attachment
[ ] Bill of Review
[ ] Certiorari
[ ] Class Action
[x] Declaratory Judgment
[ ] Garnishment
[ ] Interpleader
[ ] License
[ ] Mandamus
[ ] Post-judgment
[ ] Prejudgment Remedy
[ ] Protective Order
[ ] Receiver
[ ] Sequestration
[ ] Temporary Restraining Order/Injunction
[ ] Turnover

## 4. Indicate damages sought (do not select if it is a family law case):
[ ] Less than $100,000, including damages of any kind, penalties, costs, expenses, pre-judgment interest, and attorney fees
[ ] Less than $100,000 and non-monetary relief
[x] Over $100, 000 but not more than $200,000
[ ] Over $200,000 but not more than $1,000,000
[ ] Over $1,000,000

Rev 2/13

# EXHIBIT "5"

CAUSE NO. DC-16-04299

FILED

| | | |
|---|---|---|
| PHILIP GEORGE-BOTROS | § | IN THE DISTRICT COURT 2016 APR 25 AM 11: 56 |
| | § | |
| vs. | § | 162ND JUDICIAL DISTRICT TEXAS |
| | § | |
| SUN LIFE ASSURANCE COMPANY | § | |
| OF CANADA | § | DALLAS COUNTY, TEXAS |

DEPUTY

## AFFIDAVIT

Before me, the undersigned authority, personally appeared KATHLEEN ATWOOD, who swore under oath tht the following facts are true and correct:

"My name is KATHLEEN ATWOOD. I am a private process server authorized by the Supreme Court of Texas. My authorization number is SCH 157. My address is 6440 North Central Expressway, Suite 705, Dallas, Texas 75206. My telephone number is (214) 369-5400.

"I received Citation and Petition in the above matter at 1:00 p.m. on April 19, 2016. I delivered same, in person, having first endorsed on the Citation the date of delivery, to Defendant, **SUN LIFE ASSURANCE COMPANY OF CANADA**, by delivery to its Registered Agent, CT CORPORATION SYSTEM, by and through its authorized representative, TERRI THONGSAVAT, 1999 Bryan Street, Suite 900, Dallas, Texas 75201, at 3:40 p.m. on April 19, 2016.

"I am not a party to this case nor am I related to, employed by or otherwise connected to (other than having been retained to provide services in this case) any party or any party's attorney in this case and I have no interest in the outcome of this lawsuit.

"I am over the age of eighteen (18) years. I am of sound mind and have never been convicted of a felony or misdemeanor involving moral turpitude.

Fees:   For Serving Citation: $ ___65.00___

KATHLEEN ATWOOD
Supreme Court of Texas Certification No. SCH 157
Certification Expires: July 31, 2017

On this day personally appeared KATHLEEN ATWOOD, known to me to be the person whose name is subscribed to the foregoing document and, being by me first duly sworn, declared under oath that the statements therein contained are true and correct.

Given under my hand and seal of office this 21st day of April, 2016.

NOTARY PUBLIC



ROSE A. SMITH
Notary Public, State of Texas
Comm. Expires 07-25-2017
Notary ID 10926518

# FORM NO. 353-3 - CITATION
# THE STATE OF TEXAS

To:

**SUN LIFE ASSURANCE COMPANY OF CANADA**
**BY SERVING ITS REGISTERED AGENT CT CORPORATION SYSTEM**
**1999 BRYAN ST STE 900**
**DALLAS TX 75201**

GREETINGS:
You have been sued. You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10 o'clock a.m. of the Monday next following the expiration of twenty  days after you were served this citation and  petition, a default judgment may be taken against you.  Your answer should be addressed to the
clerk of the **162nd District Court** at 600 Commerce Street, Ste. 101, Dallas, Texas 75202.

Said Plaintiff being **PHILIP GEORGE-BOTROS**

Filed in said Court **13th day of April, 2016** against

**SUN LIFE ASSURANCE COMPANY OF CANADA**

For Suit, said suit being numbered <u>DC-16-04299,</u> the nature of which demand is as follows:
Suit on **OTHER (CIVIL)** etc. as shown on said petition ,
a copy of which accompanies this citation.  If this citation is not served, it shall be returned unexecuted.

WITNESS: FELICIA PITRE, Clerk of the District Courts of Dallas, County Texas.
Given under my hand and the Seal of said Court at office this 15th day of April, 2016.

ATTEST: FELICIA PITRE, Clerk of the District Courts of Dallas, County, Texas

By_____/s/ Carmen Moorer_____, Deputy
         CARMEN MOORER



| ESERVE |
| --- |
| CITATION |
| DC-16-04299 |

**PHILIP GEORGE-BOTROS**
vs.
**SUN LIFE ASSURANCE COMPANY OF CANADA**

ISSUED THIS
**15th day of April, 2016**

FELICIA PITRE
Clerk District Courts,
Dallas County, Texas

By: CARMEN MOORER, Deputy

**Attorney for Plaintiff**
JAMES L JOHNSON
JAMESLJOHNSON@COVAD.NET
SUITE 345 LB 30
6500 GREENVILLE AVENUE
DALLAS  TX 75206
214-363-1629

# DALLAS COUNTY
# SERVICE FEES
# NOT PAID

# OFFICER'S RETURN

Case No. : DC-16-04299

Court No. 162nd District Court

Style: PHILIP GEORGE-BOTROS

vs.

SUN LIFE ASSURANCE COMPANY OF CANADA


Came to hand on the _____day of _____, 20_____, at _____o'clock_____.M. Executed at _____,

within the County of _____ at _____o'clock _____.M. on the _____day of_____,

20_____, by delivering to the within named

_____

_____

each, in person, a true copy of this Citation together with the accompanying copy of this pleading, having first endorsed on same date of delivery.  The distance actually traveled by

me in serving such process was _____miles and my fees are as follows:  To certify which witness my hand.


| | | |
|---|---|---|
| For serving Citation | $_____ | _____ |
| For mileage | $_____ | of_____County, _____ |
| For Notary | $_____ | By_____Deputy |

(Must be verified if served outside the State of Texas.)

Signed and sworn to by the said_____before me this_____day of_____, 20_____,

to certify which witness my hand and seal of office.


_____

Notary Public_____County_____

# EXHIBIT "6"

FILED
DALLAS COUNTY
5/5/2016 2:14:08 PM
FELICIA PITRE
DISTRICT CLERK

CAUSE NO. DC-16-04299

| | | |
|---|---|---|
| PHILIP GEORGE-BOTROS, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | DALLAS COUNTY, TEXAS |
| | § | |
| SUN LIFE ASSURANCE COMPANY | § | |
| OF CANADA, | § | |
| | § | |
| Defendant. | § | 162ND JUDICIAL DISTRICT |

## DEFENDANT'S ORIGINAL ANSWER

Defendant Sun Life Assurance Company of Canada ("Sun Life") files this Original Answer to Plaintiff's Original Petition ("Petition") filed by Plaintiff Philip George-Botros ("Plaintiff") and states:

### I.    GENERAL DENIAL

Sun Life denies all the allegations contained in Plaintiff's Petition pursuant to Rule 92 of the Texas Rules of Civil Procedure and demands strict proof thereof in accordance with the laws of the State of Texas.

### II.    PRAYER

Sun Life requests the following relief:

a.    That Plaintiff take nothing by reason of his suit;

b.    That Plaintiff's claims be dismissed with prejudice;

c.    That Sun Life recover its attorneys' fees and costs of court; and

d.    That Sun Life has all such other and further relief, at law and in equity, to which Sun Life may show itself justly entitled.

---

Respectfully submitted,


By: /s/ *Bill E. Davidoff*
     Bill E. Davidoff
     State Bar No. 00790565
     bill.davidoff@figdav.com


FIGARI + DAVENPORT, LLP
901 Main Street, Suite 3400
Dallas, TX 75202-3796
Tel: 214.939.2000
Fax: 214.939.2090

ATTORNEYS FOR DEFENDANT SUN LIFE
ASSURANCE COMPANY OF CANADA

## CERTIFICATE OF SERVICE

On the 5th day of May, 2016, the foregoing instrument was sent via electronic service to James L. Johnson, The Johnson Law Firm, 6500 Greenville Avenue, Suite 345, Dallas, TX 75206.

     /s/ *Bill E. Davidoff*
     Bill E. Davidoff